# United States Court of Appeals
### For the Eighth Circuit

_____

No. 14-3866

_____

United States of America

*Plaintiff - Appellee*

v.

Michael L. Bradford, also known as Derrick Lamont Brown

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: September 25, 2015
Filed: December 3, 2015

_____

Before WOLLMAN, COLLOTON, and KELLY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Michael L. Bradford pleaded guilty to two counts of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and one count of distribution and possession with intent to distribute a mixture or substance containing PCP and marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

Bradford appeals, arguing that the district court[1] erred in denying his motions for a subpoena *ad testificandum* and a subpoena *duces tecum*. We affirm.

## I. Background

In late 2011, a joint task force of federal and local authorities established a covert storefront operation. According to Special Agent Tyree Koerner of the Bureau of Alcohol, Tobacco, Firearms and Explosives, the purpose of the operation was "[t]o take illegal firearms off the street."

Bradford sold or facilitated the sale of drugs and firearms to the storefront operation. In late September 2012, Bradford contacted an undercover agent and told him that a friend was willing to sell hand grenades. Bradford thereafter brought David LaBlance to the storefront, where Bradford facilitated the sale of a non-functioning grenade by LaBlance to an undercover agent. On October 30, 2012, LaBlance was found dead, having been shot twice in the head.

On November 1, 2012, Bradford called a confidential informant, telling him that he had a "dirty" firearm for sale. The confidential informant instructed Bradford to bring the firearm to the storefront on the following Monday, which he did. Bradford sold the firearm—a Llama .38 caliber revolver—to an undercover agent. When asked by the agent about the LaBlance murder, Bradford replied that he had been with him the morning of October 30, but that they later had separated. Bradford also said that he thought LaBlance was getting in "over his head."

It was later determined that the Llama .38 caliber revolver had been used in LaBlance's murder, testing having revealed that the two bullets recovered from

---

[1]The Honorable David Gregory Kays, Chief Judge, United States District Court for the Western District of Missouri.

LaBlance's head matched the firearm.  A bullet from an earlier gunshot wound was found in LaBlance's hip.

Bradford was arrested and later charged in a five-count superseding indictment. He entered into a written plea agreement with the government.  The agreement included an appeal waiver and a binding sentencing recommendation of no less than 180 months' imprisonment and no more than 300 months' imprisonment.  Bradford thereafter pleaded guilty to the three counts set forth above, and the remaining charges were dismissed.

The presentence investigation report (PSR) applied § 2K2.1(a)-(b) of the U.S. Sentencing Guidelines Manual (Guidelines), which sets forth the base offense level for the unlawful possession of firearms and the specific offense characteristics that increase or decrease the base offense level.  The PSR did not apply the cross-reference set forth in § 2K2.1(c)(1)(B), which instructs the district court to apply "the most analogous offense guideline" from the homicide subpart, 2A1, when the defendant used any firearm in connection with the commission of another offense, death resulted, and the resulting offense level is greater than the one determined without the cross-reference.  The government argued that the cross-reference should apply because Bradford used the Llama .38 caliber revolver in the murder of LaBlance, the most analogous offense guideline was § 2A1.2 (second-degree murder), and Bradford's offense level under § 2A1.2 was greater than his offense level under § 2K2.1(a)-(b).

Bradford filed two pre-sentencing *ex parte* motions for subpoenas.[2]  The first requested a subpoena *ad testificandum* that would require Bradford's father to appear at the sentencing hearing for the purpose of testifying "to his contact with Michael

_____

[2]We grant Bradford's unopposed motion to supplement the record with copies of the two *ex parte* motions.

Bradford on October 30, 2012 and October 31, 2012." The second requested a subpoena *duces tecum* that would require the Truman Medical Center to release "medical records related to treatment of David LaBlance . . . related to gunshot wounds between the dates of October 29, 2011 and October 29, 2012." The district court denied the motions.

At sentencing, defense counsel proffered that on October 30, the night of LaBlance's murder, Bradford's family had gathered to discuss what might happen in a criminal case pending against Bradford's father. Counsel stated:

> It's not an alibi, because nobody can say [Bradford] was there at the time of the murder. So absolutely not an alibi. But they can say that he spent a good portion of his time that evening with them.
>
> And I think it helps establish the fact that he's not thinking about going out and murdering somebody. He's actually very concerned about his father who then the next day pled guilty in a rape case in Jackson County and went to prison.

The government did not object to the proffer, and the district court accepted it. In support of the § 2K2.1(c)(1)(B) cross-reference, the government presented the testimony of Special Agent Koerner and a time line of events linking Bradford to LaBlance's murder. During cross-examination, defense counsel asked Koerner about the bullet found in LaBlance's hip. Koerner testified that, according to the forensics report, the bullet "was from a previous gunshot wound that was never pulled out."

The district court found that the evidence supported the § 2K2.1(c)(1)(B) cross-reference to § 2A1.2, which resulted in an advisory Guidelines sentencing range of 292 to 365 months' imprisonment. The district court sentenced Bradford to 300 months' imprisonment, the maximum term allowed under the plea agreement.

-4-

## II. Discussion

### A. Appeal Waiver

The government argues that Bradford's appeal should be dismissed because it falls within the scope of the appeal waiver set forth in his plea agreement. We generally will enforce an appeal waiver "as long as the appeal falls within the scope of the waiver, and the defendant's accession to the plea agreement and the waiver was knowing and voluntary." United States v. Azure, 571 F.3d 769, 772 (8th Cir. 2009). The government bears the burden of establishing that the plea agreement clearly and unambiguously waives the defendant's right to appeal. United States v. Andis, 333 F.3d 886, 890 (8th Cir. 2003) (en banc). We conclude that the government did not meet that burden here.

The waiver in Bradford's plea agreement states, in relevant part:

> The defendant expressly waives the right to appeal any sentence, directly or collaterally, on any ground *except* the following five (5) claims: . . . (3) an illegal sentence; . . . . An "illegal sentence" includes a sentence imposed in excess of the statutory maximum or different from the range recommended in this binding plea agreement, but does *not* include less serious sentencing errors, such as a misapplication of the Sentencing Guidelines or an abuse of discretion.

The government argues that the plea agreement gives the term "illegal sentence" the same meaning as our en banc court gave the term in United States v. Andis, in which we stated that we will "refuse to enforce an otherwise valid waiver if to do so would result in a miscarriage of justice." 333 F.3d at 891. We went on to explain that a miscarriage of justice results if the district court imposes an illegal sentence, but we emphasized that "the illegal sentence exception to the general enforceability of an appeal waiver is an extremely narrow exception." Id. at 892.

"Any sentence imposed within the statutory range is not subject to appeal. Specifically, an allegation that the sentencing judge misapplied the Sentencing Guidelines or abused his or her discretion is not subject to appeal in the face of a valid appeal waiver." Id.

Despite the government's argument to the contrary, the definition of "illegal sentence" set forth in Bradford's appeal waiver is materially different from the language set forth in Andis. Unlike in Andis, the appeal waiver here does not precisely limit the definition of an illegal sentence. The appeal waiver does not state, for example, that a sentence is illegal only if it is greater than the statutory maximum or if it is outside the sentencing range set forth in the plea agreement. Instead, it provides that an illegal sentence "includes" at least two types of sentences and "does not include" at least two "less serious sentencing errors." The language thus implies that there exists a range of sentencing errors and that not all of those errors fall within the scope of the waiver. Bradford has argued that his constitutional rights were violated at sentencing, which, if true, might bring his sentence within the appeal waiver's definition of illegal sentence. Accordingly, because the government has not shown that Bradford clearly and unambiguously waived his right to bring this appeal, we will proceed to the merits of Bradford's argument.

## B. Subpoenas

Bradford argues that the district court denied his Sixth Amendment right to compulsory process and his Fifth Amendment right to due process when it refused to issue subpoenas under Rule 17 of the Federal Rules of Criminal Procedure. We disagree.

Under Rule 17(b), a "court must order that a subpoena be issued for a named witness if the defendant shows an inability to pay the witness's fees and the necessity of the witness's presence for an adequate defense." Bradford failed to establish that

his father's presence was needed at sentencing, for his motion for a subpoena *ad testificandum* alleged only that his father would testify regarding their contact on the day of and the day after LaBlance's murder. "Mere allegations of materiality and necessity are not sufficient to establish that a witness is necessary to an adequate defense." United States v. LeAmous, 754 F.2d 795, 798 (8th Cir. 1985). Moreover, the district court accepted as true defense counsel's proffer that Bradford had gathered with his family on the evening of October 30. Bradford's failure to explain what additional information his father would have provided fell short of satisfying Rule 17(b)'s requirements, and thus the district court did not err in denying the motion.

A subpoena *duces tecum* orders a witness to produce documents within its control. Fed. R. Crim. P. 17(c). The requesting party must identify the documents with adequate specificity and show that the documents are relevant and admissible. United States v. Stevenson, 727 F.3d 826, 831 (8th Cir. 2013). Bradford states that he "requested a subpoena *duces tecum* for LaBlance's medical records for the year preceding his death . . . in an effort to verify that LaBlance had been previously shot a short time before his death on October 30, 2012." Bradford argues that LaBlance's medical records were relevant because they might have contained information tending to show that Bradford was not the person who killed LaBlance. "The relevance and specificity elements 'require more than the title of a document and conjecture as to its contents,' and a subpoena should not issue based upon a party's 'mere hope' that it will turn up favorable evidence." Stevenson, 727 F.3d at 831 (quoting United States v. Hang, 75 F.3d 1275, 1283 (8th Cir. 1996)). We view Bradford's request as a "mere hope" that LaBlance's medical records might identify someone who was motivated to injure or kill LaBlance, particularly in light of the fact that the district court had before it testimony that LaBlance had been shot in the hip in an incident unrelated to his killing. Bradford thus failed to show that a subpoena was warranted, and the district court did not err in denying the motion that it be issued.

## III.  Conclusion

The judgment is affirmed.

_____